UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
GERMAINE NERO,                                            :
                                Plaintiff,                :   **MEMORANDUM**
                                                          :   **DECISION AND ORDER**
                - against -                               :
                                                          :   15-cv-3751 (BMC)(LB)
MTA NEW YORK CITY TRANSIT                                 :
AUTHORITY,                                                :
                                                          :
                                Defendant.                :
----------------------------------------------------------X

**COGAN,** District Judge.

Plaintiff, who originally brought this action *pro se* but has since retained counsel, claims that he was passed over for promotion in a civil service job as a result of being an alcoholic or a recovering alcoholic in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and state and local law. The case is before me on defendants' motion for summary judgment. The motion must be granted.

First, the claim is both administratively and judicially time-barred. Plaintiff failed to file his administrative claim with the Equal Opportunity Employment Commission ("EEOC") within 300 days of the alleged discrimination.

Second, if I were to reach the merits of plaintiff's case, all that plaintiff has shown is that he has a different theory of how his out-of-work days should be counted than does his employer. Plaintiff thinks only days officially marked "sick" should be counted, and when he compares himself on that basis with non-disabled employees who were promoted, his attendance record is slightly better. His employer, however, thinks that both officially marked sick days *and* absence days that are not explained should count as part of employees' attendance record, and when they are, plaintiff's record was inferior to those in his promotion-eligible group.

His employer's methodology not only makes more sense, but there is nothing about his employer's methodology that bespeaks discriminatory animus. There is thus no admissible evidence indicating that defendants considered plaintiff's condition when it awarded the promotion to a different candidate.

**BACKGROUND**

Plaintiff was hired as a train operator by defendant the New York City Transit Authority (the "TA") in 2002. It is a civil service position that he still holds. In November 2006, he was arrested for driving while intoxicated. He advised the TA of his arrest for DWI, but not that he was an alcoholic. Plaintiff took 29 days off to treat his alcoholism, but did not disclose the reason for his absence until after he was passed over for promotion in 2011. In 2011, he sat for a civil service exam, on which he scored well, but he claims he was passed over for promotion to dispatcher because of his status as a recovering alcoholic.[1]

In determining how to fill open spots for promotion, the TA uses the familiar "one in three" rule outlined in New York Civil Service Law § 61. The operation of the rule has been described in detail in many cases, see, e.g., Wood v. N.Y.C. Transit Auth., No. 11-cv-3560, 2015 WL 1469398 (E.D.N.Y. March 30, 2015), and I will not repeat that discussion here, as the parties are largely in agreement as to how it applied in plaintiff's case except for the final stage. Suffice to note that qualified individuals are put into a group, or cluster, of three, and if they do not qualify as a finalist as compared to the other two in their cluster, they drop into another cluster of three to see how they compare in that cluster; if they do not qualify as a finalist in that second cluster, they drop into one more cluster of three, and if they do not prevail over the other two in that cluster, then they do not make it to final consideration.

---

[1] Plaintiff originally claimed that he was also wrongly passed over for a 2014 promotion, but he has withdrawn that claim.

2

The dispute here has narrowed to the sole question of how to compare attendance records between otherwise qualified employees. The TA uses two variables to assess attendance: "instances" and "absences." These are causally related – an instance is an event which causes an absence. The example the TA gives is a car accident – one instance – which causes a ten day absence – ten absences. For reasons that I think are obvious, an employee with 30 absence days based on one instance is considered to have a better attendance record than an employee with 30 absence days based on 30 instances.

When plaintiff came up for promotion in 2011, the TA used a three-year "look-back" period to measure attendance.[2] Plaintiff agrees that he did not have the best attendance record in his first cluster of three – he was at 17 instances and 23.5 absence days (17/23.5),[3] and one of the other two comparators in his cluster of three had 5 instances and 5 absence days. Under the one in three rule, plaintiff was therefore dropped into the next cluster of three. As the TA interpreted his attendance record, he was not the best in that group either – not only did his 17/23.5 compare unfavorably to one of the other comparators (15/25.75), but that other comparator had no disciplinary record while plaintiff had four violations including an instance of being away without official leave.

Thus, plaintiff had one final chance – the third cluster in the "one in three." The person selected from that group had 11 instances and 30.5 days compared to plaintiff's 17 instances and 23.5 days. She also had far greater seniority to plaintiff. Plaintiff therefore did not advance.

---

[2] Plaintiff also alleges that the TA miscalculated his total number of remaining leave days as a percent of his potential sick leave accumulation. Specifically, plaintiff contends that the TA's miscalculation showed him as having less than 50% of his potential sick leave remaining, that by his calculation he was at exactly 50% use, and that he was removed from consideration because of the miscalculation. This argument fails because he was placed into three clusters, and, as discussed below, of those three clusters, he was not the best candidate in any.

[3] As noted below, plaintiff contends that his actual record was 13 instances and 20 absences because the 4 instances and 3.5 absences were "leave without pay" rather than "sick days." I explain below why the distinction he attempts to make is immaterial.

3

**DISCUSSION**

**I**

In New York, a plaintiff seeking to bring a claim for disability discrimination in employment under the ADA must file an EEOC charge within 300 days of the alleged discriminatory act. 42 U.S.C. § 12117(a) (incorporating Title VII procedural requirements into the ADA); Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-5(e)(1)). Here, it is undisputed that plaintiff did not file his EEOC claim until, at the earliest, November 12, 2014. He was notified that he did not receive the promotion, at the latest, on January 30, 2012. The period between these dates is far more than 300 days.

Plaintiff's only response to this is that when the EEOC issued his right to sue letter, it did not check the box on the form letter stating that his claim was "not timely filed."[4] Rather, it checked only the box stating that it was "unable to conclude that the information obtained establishes violations of the statutes." From that, plaintiff concludes that the EEOC made a finding that is binding on both defendant and this Court that his administrative claim was timely filed.

The argument is fallacious for numerous reasons. First, 300 days is 300 days, and nothing in the right to sue letter purports to change that fact. Second, plaintiff has ignored the language in the very same paragraph of the letter on which he relies, which states, "No finding is made as to any other issues that might be construed as having been raised by this charge." Third, just as plaintiff cannot be bound by the EEOC's finding of insufficient facts to establish a statutory violation, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798-99, 93 S. Ct. 1817, 1822-23 (1973), so are defendant and the Court not bound by the absence of any EEOC

---

[4] Plaintiff concedes that his supplemental claims under the New York State Human Rights Law and the New York City Human Rights Law are barred by their respective 3-year statutes of limitations.

4

finding on the timeliness of plaintiff's filing. Finally, plaintiff points to nothing in any employment discrimination statute that would give the EEOC the unilateral ability to reinstate a statutory filing period that had already expired at the time the administrative claim was filed. Accordingly, plaintiff's ADA claim is untimely.

**II**

Even if I were to reach the merits of plaintiff's claim, I would find that it has none. "[T]he ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability. Specifically, it provides that no covered employer 'shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [advancement] . . . .'" Sutton v. United Air Lines, Inc., 527 U.S. 471, 477, 119 S. Ct. 2139, 2144 (1999) (quoting 42 U.S.C. § 12112(a)). "In analyzing a discriminatory [failure to promote] claim under the ADA, we apply the [familiar] burden-shifting analysis established by the Supreme Court in [McDonnell Douglas]." Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999).

I need not spell out the McDonnell Douglas framework as it applies to this case because it is clear that plaintiff cannot even meet the factors for demonstrating a *prima facie* case, specifically, the fourth factor, which requires him to show circumstances giving rise to an inference that he was excluded based on his status as a recovering alcoholic. There are no such circumstances here.

Plaintiff concedes that he was properly passed over in his first cluster of three. He contends, however, that in his second and third clusters of three, he was not properly passed over because his instances and absence days that were not all marked as sick days; some instead were

5

marked as "LWOP" (leave without pay) and should not count against him as instances or absences. Indeed, plaintiff goes so far as to argue that by counting LWOP days, the TA is offering a pretextual reason for not moving him forward, and thus the counting of LWOP days is itself evidence of discrimination.

But why should LWOP days not count? It seems to me that, logically, LWOP days are an even greater indicator of employee unreliability than sick days, the latter of which can at least be verified and are to some extent beyond the control of the employee. Plaintiff's theory of absences would allow an employee to take as many LWOP days as he wanted, leaving his sick leave days unused, and still stand in an equal or even superior footing for promotional purposes as compared to an employee who only used bona fide sick leave. Plaintiff's theory makes no sense.

Plaintiff's attempt to justify the absurd is, to say the least, manipulative. He relies on general testimony of some of the TA's witnesses during depositions in which they referred to attendance records as "sick" records; from this, he concludes that they were excluding LWOP days. But they never said that, and his attorney never asked them if they were excluding LWOP days. It is quite clear from the context of the testimony that there was no such exclusion; the focus of the testimony was on sick days because, as any employer would hope, sick days, not LWOP days, explain most employee absences. In addition, since this is an ADA case, the focus of the testimony was on sick days and how they are counted. Plaintiff never contended that LWOP days should be excluded until he opposed the TA's motion for summary judgment.

The TA was entirely consistent in counting LWOP absences for employees. The forms of individuals who made up the remaining members of plaintiff's cluster, show that, for the ones who used LWOP absences, those absences were counted in addition to their sick leave absences.

6

In fact, the TA employee who was promoted from plaintiff's last cluster was promoted because her sick leave and LWOP instances and absences, added together, were still fewer than plaintiff's.

Thus, even if I were to give plaintiff's theory more credit than it deserves to establish a *prima facie* case of disability discrimination (considering the *de minimis* showing required at that step), he would still fail utterly at the third step of <u>McDonnell Douglas</u>. The record is undisputed that the TA considers LWOP days in computing attendance records as a regular part of its process. As pointed out above, it is thoroughly logical for it to do that. Plaintiff has offered no evidence that it was done here especially to discriminate against him or that it was not done to others similarly seeking promotion. Nor could any reasonable jury find that he was the victim of discrimination.

Plaintiff makes one more attempt to demonstrate animus based on disability. At his deposition, plaintiff testified to a conversation that he had with a TA administrator, Barbara Shivers, after he was passed over for the 2011 promotion. Shivers was not involved in the selection decision in the one-in-three process. She would simply compile the employee attendance records and then send the promotions committee however many years it requested. Her conversation with plaintiff pertained to the 29 absence days that had been charged against him in 2006. Significantly, those absence days had nothing to do with the 2011 promotion because they were outside of the three-year look back period.

According to plaintiff's deposition testimony, when he called her after being passed over for the 2011 promotion, she told him that he had 29 sick days in 2006. He asked her why. She said she did not know why; she just saw that 29 days were missing and it was not her practice to check for a reason. He then advised her that those 29 days were for alcoholism treatment. She

7

thereupon agreed, according to his testimony, to restore the days and resubmit the paperwork. But of course, the resubmission of the paperwork made no difference, both because the 2011 promotion had already been awarded, but also because the absences at issue were outside the three-year look back period, so the promotions committee would not consider those absences in any event.

In opposition to defendant's motion for summary judgment, plaintiff has submitted an affidavit with a materially different story. He there avers that in his post-promotion conversation with Ms. Shivers, she "specifically stated I was non-selected because I was out for 29 days to treat my alcoholism in 2006/2007." In other words, even though he testified in his deposition that it was he who told Shivers that these 29 days were for treatment, and that she agreed to resubmit his attendance schedule taking that fact into account, he is now averring that she already knew that when he called her, and that she specifically told him that this was the reason he was not promoted.

The emergence of this new story was not just a response to defendant's summary judgment motion. Prior to the motion, I had required the parties to submit detailed letters describing the anticipated record and their positions in preparation for a premotion conference. Plaintiff's letter said nothing about this alleged conversation with Shivers – the only direct evidence of discriminatory animus that he now offers. His letter was based only on his other argument that the LWOP days should not be counted.

At the premotion conference, I pointed out to plaintiff's counsel (and to plaintiff, who was present), that it would not be sufficient to simply show that he disagreed with the methodology used to compute absence days:

> THE COURT: But let me tell you candidly how it looks. You have got a dispute over numbers. What I am not seeing is a dispute over whether somebody, I do not even know

8

who from your letter, said we do not want to promote this guy because he is an alcoholic. So the way this comes in front of a jury, it seems to me, would be who is right on the numbers? Well, for purposes of summary judgment I will assume you are right on the numbers. That is fine, but so what? Do you have anything else?

When asked at the conference whether there were any derogatory statements made, plaintiff's counsel flatly stated there were "no derogatory statements," and he at no time made any mention of the new version of plaintiff's conversation with Ms. Shivers. Thus, only after the premotion conference, and only after reviewing defendant's motion for summary judgment, did plaintiff offer the new version of his conversation with Ms. Shivers to try to support some theory of discriminatory animus.

The law is well settled that he cannot contradict his deposition testimony with an affidavit to raise an issue of fact. See, e.g., Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Defendant is entitled to rely on the testimony it obtained from plaintiff at his deposition in filing its motion for summary judgment. Even without regard to the fact that plaintiff's conversation with Ms. Shivers concerned a time period that was not part of the period under consideration for his 2011 promotion, I will not consider his contradictory affidavit. Without it, there is no evidence at all that either Ms. Shivers knew that plaintiff was a recovering alcoholic when he was not promoted or that this information had any bearing on the decision to not promote plaintiff. There is no merit to his claim.

## III

There is one final matter that requires note. It arises from the fact, as mentioned above, that plaintiff originally commenced this case *pro se*, and counsel appeared for him only after it was filed. In many cases, the Court regards that as a positive development, both from the plaintiff's and the Court's perspective, not only because the plaintiff now has a learned advocate,

but also because the attorney and plaintiff can have frank discussions about the viability of the claims. Here, it is not clear whether this purpose was served.

The vast majority of employment discrimination cases in this district are brought on a contingent-fee basis because all of the relevant statutes provide for the recovery of attorneys' fees and costs separate and apart from the compensation payable to the plaintiff. See, e.g., 42 U.S.C. § 12205 (ADA); 42 U.S.C. § 2000e–5(k) (Title VII); 29 U.S.C. § 626(b) (Age Discrimination in Employment Act, incorporating by reference 29 U.S.C. § 216(b) of the Fair Labor Standards Act). These fee-shifting provisions serve two salutary purposes. Primarily, they allow the pursuit of claims that individuals often lack the resources to fund on their own. See City of Riverside v. Rivera, 477 U.S. 561, 576, 106 S. Ct. 2686, 2695 (1986). Almost as importantly, they serve as a check by the plaintiff's attorney as to the merits or at least potential settlement value of the case. Because the attorney is investing his own time and usually advancing costs in the case, he is not going to take on the case unless he sees sufficient merit to warrant an expectation of recovery beyond his investment. And because there is no shortage of employment discrimination attorneys in this district, it is not an exaggeration to say that if a plaintiff is unable to find a qualified attorney to take his case on a contingent-fee basis, and is instead compelled to proceed *pro se*, then, in some cases, it may be an indication that the case presents more than the usual amount of difficulties in yielding a recovery by way of settlement or judgment.

When a plaintiff is able to, and does, pay out-of-pocket for attorneys' fees, however, the merits-check purpose is defeated. An attorney's willingness to take a case on a fee-paying basis may reduce the incentive towards candor with the client about the merits of a case. But the need for candor between attorney and client is particularly important in employment discrimination

cases. Feelings can run high. Employees understandably can have difficulty accepting that a failure to advance or other workplace difficulties may be the result of their own shortcomings, or just plain bad luck, instead seizing upon their immutable characteristics as an avoidance mechanism. In these cases, an attorney, fulfilling the role of wise counselor, can be just as important in deterring the pursuit of meritless cases as in the prosecution of those that are meritorious.

I do not know with certainty what the fee arrangements were between plaintiff and his attorney. Because I am granting defendant's motion for summary judgment, there will be no fee application, and I have no basis to inquire. But based on the high quality of the work performed by plaintiff's attorney, it seems to me that there is a substantial chance that he has received a fee for the work that he has done. Despite the lack of merit to the arguments, the submissions in opposition to the motion for summary judgment were first rate and indicative of an attorney with a thorough understanding of how to draft papers and present arguments in an employment case. And my discussion with plaintiff's attorney at the premotion conference similarly impressed upon me that he fully understood the impediments to recovery here.

Thus, plaintiff obtained an excellent attorney to prosecute his case, but the case should not have been prosecuted. The statute of limitations bar was clear, as was the inability to demonstrate a *prima facie* case.

If plaintiff's attorney had a full and frank discussion with plaintiff about the unlikelihood of prevailing in this case before he agreed to proceed on his behalf, and plaintiff decided to spend money on it anyway, that was plaintiff's prerogative, as the case does not present Rule 11 issues. But I would certainly hope and expect that plaintiff's attorney did not create or even allow to be

perpetuated any false hopes on his client's part if he accepted a retainer in this case, as there was little realistic chance of recovery.

## CONCLUSION

Defendant's motion for summary judgment is granted. The Clerk is directed to enter judgment, dismissing the complaint.

**SO ORDERED.**

                                                                              U.S.D.J.

Dated: Brooklyn, New York
        November 16, 2016